UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-10618
_____


MICHAEL LEE MCBRIDE, also known as
Michael McBride,

                              Petitioner-Appellant,

                    versus

GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

                              Respondent-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Texas
(5:95-CV-24-C)
_____

July 29, 1997

Before SMITH, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge:[*]

Michael Lee McBride, a Texas prisoner under a sentence of death, appeals from the district court's denial of his petition for writ of habeas corpus. We affirm.

I.    FACTS AND PROCEDURAL HISTORY

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

On October 18, 1985, James Holzer, Cody Minnick, and Karen Tidwell, traveled from Fort Worth to Lubbock to visit their friend Christian Fisher, a student at Texas Tech University.[1] McBride had been dating Fisher for almost a year and was angry that Holzer and Minnick were staying in Fisher's apartment. On Saturday, October 19, 1985, McBride entered the apartment with a key and attacked Holzer as he slept on the couch. McBride loudly accused Holzer of "sleeping with [his] girlfriend," although testimony showed that during the visit Holzer slept on the couch, Minnick on the floor, and Tidwell with Fisher in her room. A struggle ensued between Minnick, Holzer, and McBride, during which a glass bookcase was broken. The two visitors subdued McBride, but before departing he picked up a pair of sunglasses, smashed them, and threw them on the floor.

McBride did not again contact the group at Fisher's apartment until Monday evening, October 21st, when he phoned Fisher. McBride and Fisher were apparently ending their "very stormy" relationship, and McBride proposed to pay Fisher some money he owed her. Minnick testified that, unbeknownst to McBride and Fisher, he picked up a second telephone and listened in on the conversation. McBride told Fisher to come to his house "alone" so that he could give her a painting worth the amount of his debt. He also told Fisher, "[I]f I can't have you, nobody will."

---

[1] The facts are taken from the opinion on McBride's direct appeal. McBride v. State, 862 S.W.2d 600, 602 (Tex. Crim. App. 1993), cert. denied, 114 S.Ct. 2765 (1994).

2

Fisher's friends expressed concern for her safety, so all four traveled to McBride's house in two cars. Fisher and Holzer parked in front of McBride's house in Fisher's car and Minnick and Tidwell parked several car lengths behind them. When Fisher knocked at the front door, McBride's house was very dark and he did not answer. As Fisher walked back to her car, Minnick saw a person behind his car and heard a gun cock, and then saw McBride pointing a rifle at him; the "rifle was a `military version' .30 caliber M-1 carbine with a 30 round clip." McBride ordered Minnick and Tidwell to get out of the car or he would kill them and he then smashed out Minnick's driver's side window with the rifle butt. McBride fired two "warning shots" into the air. He then moved toward Fisher, at which time Minnick fled to a nearby house for help.

Several of McBride's neighbors witnessed the double murder that occurred moments later. Tidwell testified that McBride and Fisher seemed to struggle with the rifle in the middle of the street before McBride shot Fisher. Eyewitnesses testified that Fisher "taunted" McBride before he shot her, by calling him a "son a bitch" and telling him to "go ahead" and shoot her. McBride shot Fisher ten times in her face, chest, abdomen, and thigh and shot her at close range even after she had fallen in the street. After shooting Fisher, McBride fired several shots through the windshield of her car, repeatedly wounding Holzer. McBride smashed out the driver's side window and continued to shoot at Holzer, even placing the rifle against Holzer's head. McBride shot Holzer nine times;

3

one shot "destroyed his heart and was fatal." McBride then shot himself under the chin in an apparent suicide attempt. The bullet went through his mouth and exited at his forehead.

When police officers and EMS personnel arrived at the scene, McBride was crawling on the ground in an apparent effort to retrieve the rifle, which several people kicked away from him. He was "violent and aggressive" with the EMS personnel and made "threatening remarks." McBride admitted to them that he killed Fisher and Holzer, "because it was time for them to go." McBride became more cooperative at the hospital but continued to make inculpatory statements. Based on this evidence, the jury convicted Michael Lee McBride of the capital murder of Fisher and Holzer. TEX. PENAL CODE § 19.03(a)(6).

At the punishment phase of the trial, several witnesses testified about McBride's relationship with Fisher. McBride, who was 23 years old, had moved from Fort Worth to be with her while she attended Texas Tech. He found a job as a bartender at a Lubbock country club. Fisher was apparently preparing to leave Lubbock because she was unhappy there. Friends and family had expressed concern about McBride's "unpredictable" behavior and his explosive temper. There was testimony suggesting that the two had been engaged.

Many witnesses testified to extraneous bad acts that demonstrated McBride's temper. For instance, a few months before the murders, McBride had punched out a man in a bar who asked

4

Fisher for a cigarette and then failed to leave McBride's and Fisher's table. McBride had nearly run over Tidwell in his car in a parking lot, apparently because Tidwell did not tell him that she and Fisher had gone to a bar a few nights before. Only sixteen days before the murders, police officers had been called to Fisher's apartment at 4:23 a.m. after Fisher reported that McBride had assaulted her. On the same day, Fisher had found a teddy bear with its head ripped off and a note from McBride stuffed inside; the note contained many profane insults and suggested that he would see Fisher "in hell."

There was testimony that McBride threatened with violence a Fort Worth police officer who moonlighted as a security guard, when the latter asked McBride to turn down his stereo. There was additional testimony that McBride punched several holes in the wall of his apartment in bursts of anger. These events were deemed "typical" of McBride's anger. Several fellow jail inmates testified that, while McBride was awaiting trial, he had on several occasions lost his temper, used offensive language, and attacked people "with little or no provocation." Three witnesses from Fort Worth, who attended Texas Tech, testified that McBride's reputation for being peaceable and law-abiding was bad. A psychiatrist opined that McBride would continue to be a threat to society.

The jury sentenced McBride to death, and the Texas Court of Criminal Appeals affirmed McBride's conviction and sentence. McBride v. State, 862 S.W.2d 600, 602 (Tex. Crim. App. 1993), cert.

5

denied, 512 U.S. 1246, 114 S.Ct. 2765 (1994). McBride unsuccessfully sought appointment of counsel to assist him in state habeas proceedings. McBride then moved for appointment of counsel in federal district court. A magistrate judge appointed McBride attorneys, who filed on his behalf a § 2254 habeas petition raising the following claims: (1) the trial court's jury instruction on punishment violated due process because it prevented the jury from considering "mitigating evidence of provocation" by victim Fisher; (2) McBride was denied effective assistance of counsel by counsel's failure to (a) investigate McBride's mental health history and (b) request a competency hearing; (3) the trial court denied him due process by failing to hold a competency hearing sua sponte; and (4) TEX. CODE CRIM. PROC. article 37.071(2)[2] was unconstitutional in that it permitted the trial court to withhold from the jury the fact that a lone dissent would result in a life sentence for the defendant. The Director filed an answer in which he waived exhaustion of state remedies regarding the issues raised.

McBride subsequently moved for leave to file an amended § 2254 petition. His request was granted, and, in his amended petition, McBride added two more claims: the prosecution had failed to disclose exculpatory testimony from a radiologist on the issue of McBride's future dangerousness, and the prosecutor engaged in prosecutorial misconduct by threatening witnesses. The Director

---

[2] McBride appeared to be referring to the current art. 37.071 § 2(a), which was codified at art. 37.071(g) at the time of his trial.

6

filed an amended answer and again waived exhaustion as to the unexhausted issues.

The magistrate judge held an evidentiary hearing at which several witnesses testified. Afterwards, the magistrate judge issued a report recommending that McBride's petition be dismissed. McBride filed objections and a motion for leave to file a second amended habeas petition, which the district court denied. The district court adopted the magistrate judge's recommendation and dismissed McBride's petition.

McBride filed a notice of appeal and moved for a certificate of probable cause ("CPC") to appeal. The district court issued a certificate of appealability ("COA") under the amended Fed. R. App. P. 22(b) and 28 U.S.C. § 2253, but did not indicate the specific issues for appeal.

II. ANALYSIS

A. APPLICABILITY OF AEDPA

As a preliminary matter, this Court has before it two motions that involve the validity of the COA issued by the district court. Although this Court previously had determined that the standards of review set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA) apply to habeas petitions pending on April 24, 1996, the date the bill became law, Drinkard v. Johnson, 97 F.3d 751, 764-66 (5th Cir. 1996), cert. denied, __ U.S. __ 117 S.Ct. 114 (1997), after the Supreme Court's intervening decision in Lindh v. Murphy, No. 96-6298, 1997 (WL 338568) (U.S. June 23, 1997), we were

7

compelled to conclude that if a habeas petition was filed with the district court prior to April 24, 1996, the petition must be reviewed for a CPC under the pre-AEDPA case law. Green v. Johnson, No. 96-50669, slip op. 4008 (5th Cir. June 27, 1997).

Accordingly, in the instant case, because McBride's petition was filed prior to the effective date of the AEDPA, we review his case under the standards in place prior to the enactment of the AEDPA. Prior to the AEDPA, a CPC, issued by either a district or circuit judge, was necessary to allow a petitioner to appeal a district court's denial of a habeas petition. See Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383 (1983).

As previously set forth, the court below granted McBride a COA, rather than a CPC. In Drinkard, we explained that the standard governing the issuance of a COA requires the same showing as that for obtaining a CPC.[3] 97 F.3d at 755-56. Thus, we now treat the district court's issuance of a COA as an issuance of a CPC, which renders moot the motions before us involving the validity of the COA.

B. CONSTITUTIONALITY OF STATUTE

McBride contends that former TEX. CODE CRIM. PROC. article 37.071(f) as used at the punishment phase of his trial was unconstitutional, as applied to his case, in that it prevented the trial court from submitting to the jury on a special verdict form

_____

[3] In Green, this Court presumed that to the extent that Drinkard does not conflict with the Supreme Court's decision in Lindh, it remains good law. Slip op. at 4013 n.2.

8

the question whether victim Christian Fisher had provoked the crime, simply because Fisher was named second in the indictment after victim Holzer. He argues that the provision prevented the jury from hearing mitigating evidence. McBride's challenge to the constitutionality of article 37.071(f) derives from Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934 (1989).

The Director argues that the claim is procedurally barred, in that the state appellate court on direct appeal denied the same claim because McBride failed to lodge an objection on this basis at trial. We disagree.

The procedural default doctrine precludes federal habeas review when the last reasoned state-court opinion addressing a claim explicitly rejects it on a state procedural ground. Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct. 2590 (1991). When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 729-30, 111 S.Ct. 2546 (1991). Procedural default does not bar federal court review of a federal claim unless the last state court rendering a judgment in the case has "`clearly and expressly' indicated that its judgment is independent of federal law, e.g., rests on a state procedural bar." Amos v. Scott, 61 F.3d 333, 338 (5th Cir.) (citing Coleman, 501 U.S. at 263), cert. denied, __

9

U.S.\_\_, 116 S.Ct. 557 (1995).

On direct appeal, McBride argued that former article 37.071(f) was unconstitutional as applied because it permitted "the State to prevent the jury from considering the mitigating circumstance of provocation via the third punishment issue." McBride, 862 S.W.2d at 610. At that time, article 37.071(f) provided that if a defendant was convicted of capital murder under TEX. PENAL CODE § 19.03(a)(6), the court was to submit to the jury three special issues with regard to the conduct of the defendant in murdering only the victim named first in the indictment. See id. at 610 n.21. The third special issue is whether, "if raised by the evidence, . . . the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, of the deceased." Id. at 610 n.22 (citing former article 37.071(b)(3)). The Court of Criminal Appeals observed that "the jury was not charged on the third punishment issue as to either victim of [the] offense, and [McBride] lodged no objection to that aspect of the charge." Id. at 611. The court found that "the evidence did not raise the issue of provocation as addressed in the third punishment issue, and hence [did] not reach the merits of [McBride's] [constitutional] contentions" with regard to that claim. Id. As such, we do not believe the Court of Criminal Appeals "clearly and expressly" stated that the judgment rested on a state procedural bar. Thus, we decline to find the claim procedurally barred.

10

Relying on <u>Vuong v. Scott</u>, 62 F.3d 673 (5th Cir.), <u>cert. denied</u>, __ U.S. __, 116 S.Ct. 557 (1995), the Director next argues that the claim is barred by <u>Teague v. Lane</u>, 489 U.S. 288, 109 S.Ct. 1060 (1989). Although the facts of <u>Vuong</u> are not identical to the facts of the instant case, we find the analysis controlling.

In <u>Vuong</u>, unlike here, the trial court did submit the third special issue regarding provocation. In accordance with former TEX. CODE CRIM. PROC. article 37.071(f), however, the third special issue dealt only with the provocation of the victim that was named first in the indictment. Vuong argued that article 37.071(f) operated to prevent the jury from considering any mitigating effect of the provocation by the victim that was named second in the indictment. To determine whether <u>Teague</u> barred review of the claim, the inquiry was whether reasonable jurists, at the time Vuong's conviction became final, would have been compelled to grant relief under <u>Penry v. Lynaugh</u>. <u>Id</u>. at 680. We explained that "if the jury was able to give proper mitigating effect to the evidence under the instructions as given, such a holding--that a special instruction is required--would constitute a "new rule" of constitutional law under <u>Teague</u>." 62 F.3d at 680. Recognizing our previous holding that the first two special issues (deliberateness of killing and future dangerousness of defendant) provide an adequate vehicle for considering the possible mitigating effect of provocation evidence, we concluded that the claim must be rejected under <u>Teague</u>. <u>Id</u>. at 682 (citing <u>White v. Collins</u>, 959 F.2d 1319

11

(5th Cir.), cert. denied, 503 U.S. 1001, 112 S.Ct. 1714 (1992)).[4]
McBride, whose conviction became final on June 27, 1994, cannot distinguish his case from Vuong.

Moreover, even if this claim was not barred by Teague, we agree with the Court of Criminal Appeals that the evidence did not raise the issue of provocation. McBride v. State, 862 S.W.2d at 611. The evidence demonstrated that, after McBride ambushed the victims, Fisher and McBride appeared to struggle with the rifle and that immediately prior to the shooting, Fisher dared McBride to shoot her.[5] The Court found the victim's "statements insufficient to constitute `provocation' where appellant creates the criminal episode as he did here, initiates the violence, and assaults several unarmed individuals with a deadly weapon." Id. Under these circumstances, we too are not convinced that McBride would have been entitled to third special issue had he so requested. Vuong, 62 F.3d at 681 (evidence that Vuong initiated violence and shot two persons prior to alleged provocation did not support a special instruction involving provocation). For all the above reasons, this claim fails.

---

[4] McBride challenges this Court's analysis in White. Because the Fifth Circuit adheres to the rule that one panel may not overrule the decision of another, we must reject his challenge. United States v. Taylor, 933 F.2d 307, 313 (5th Cir.), cert. denied, 502 U.S. 883, 112 S.Ct. 235 (1991).

[5] McBride does not specify the evidence he relies on to show provocation, but simply states that "[t]he record contains evidence of provocation of McBride by the victim, Christian Fisher, immediately prior to the homicide . . . ." (citing McBride v. State).

12

C.    INEFFECTIVE ASSISTANCE OF COUNSEL

To establish that his attorney performed ineffectively, a habeas petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  To demonstrate deficiency a defendant must show that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Judicial scrutiny of counsel's performance must be highly deferential, and courts must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct. Id. at 689.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id.

To demonstrate prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, id. at 694, and that counsel's errors were so serious that they rendered the proceedings unfair or the result unreliable.  Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838 (1993).  A failure to establish either deficient performance or prejudice defeats the claim.  Strickland, 466 U.S. at 697.  An ineffectiveness claim based on speculation or conclusional rhetoric will not warrant

13

relief.  See Lincecum v. Collins, 958 F.2d 1271, 1279-80 (5th Cir.), cert. denied, 506 U.S. 957, 113 S.Ct. 417 (1992).

### 1. Failure to investigate mental health history

McBride argues that counsel performed ineffectively by failing to investigate his "mental health history."  McBride points to his discharge from the U.S. Navy in 1983 because of a "personality disorder."  He asserts that had counsel known of "his medical discharge for a `personality disorder,' he could have further investigated [McBride's] mental health history." (emphasis added).  He contends that further investigation "could have" led to the diagnosis of a "personality disorder which might have been admissible as mitigation."

This alleged instance of ineffectiveness is based purely on speculation.  McBride has presented no evidence to suggest that he in fact did suffer from a "personality disorder" or any other psychiatric problem at the time of the murders.  At McBride's evidentiary hearing in the court below, his trial attorney, Holder, testified that he was aware that McBride had been discharged from the military several years earlier because of the "personality disorder."  McBride, however, introduced no other evidence relating to this disorder at the hearing.  He thus cannot show prejudice, i.e., a reasonable probability that any such evidence would have affected the outcome of the penalty phase.  See Byrne v. Butler, 845 F.2d 501, 517 (5th Cir.), cert. denied, 487 U.S. 1242, 108 S.Ct. 2918 (1988) (failing to allege the existence of specific

14

mitigating evidence that counsel should have obtained).

2. <u>Failure to request a competency hearing</u>

McBride argues that his self-inflicted gunshot wound should have prompted his attorney to investigate his competency to stand trial and to request a competency hearing. He vaguely contends that the "result of the proceeding would have been different" but for counsel's error.

This alleged instance of ineffectiveness also is stated in speculative fashion. McBride states that "counsel was aware of this condition, and its <u>potential</u> <u>effect</u> upon [his] competency to stand trial." (emphasis added). Further, McBride makes no assertion that he was actually incompetent at the time of his 1988 trial. Testimony at the evidentiary hearing shed little light on this claim. Holder, who was lead counsel, testified that one of McBride's witnesses at the punishment phase, Dr. Morgan, "turned around" on McBride and gave unfavorable testimony on the issue of future dangerousness, in testifying about McBride's head injury. Holder admitted, however, that McBride appeared to understand the charges against him and that McBride consulted with him in a manner that assisted in preparing his defense. McBride's other attorney, Ogan, when asked whether he had any doubt about McBride's "ability to assist you in his defense," responded that the "only reason at all" to doubt McBride's competency was the fact of the head injury itself. However, none of McBride's witnesses identified any specific evidence that suggested that he was incompetent. Holder

15

admitted that he felt there was "no basis" for requesting a competency hearing. Even assuming counsel's investigation of this claim constituted deficient performance, McBride has failed to demonstrate prejudice as to this claim.

3. <u>Failure to discover and use testimony</u>

McBride's first amended habeas petition included the claim that the prosecution suppressed the opinion of Dr. Joel Dunnington, a radiologist who assisted in McBride's treatment. After the evidentiary hearing in the court below, McBride sought leave to file a second amended petition raising the allegation that counsel rendered ineffective assistance for failing to "discover" and present at the punishment phase of the trial the testimony of Dr. Dunnington relating to future dangerousness. The district court denied his motion.

On appeal, McBride once again requests permission to amend his petition by adding this claim of ineffective assistance related to Dr. Dunnington's "testimony." Amendment to pleadings may be made under Rule 15(b) so that the pleadings will conform to the evidence adduced at trial. Such an amendment can be made at any time upon notice of a party, even at the appellate level. <u>Dunn v. Trans World Airlines, Inc.</u>, 589 F.2d 408, 412 (9th Cir. 1978). However, "[t]he purpose of Rule 15(b) is to bring the pleadings in line with issues actually tried and does not permit amendment to include collateral issues which may find incidental support in the record." <u>Monod v. Futura, Inc.</u>, 415 F.2d 1170, 1174 (10th Cir. 1969) (citing

16

<u>Gallon v. Lloyd-Thomas Company</u>, 264 F.2d 821, 825 n.3 (8th Cir. 1959)). After reviewing the record, we conclude that this particular ineffective assistance of counsel claim was not tried by consent and deny his motion for leave to amend his petition. As a result, this issue is not properly before us on appeal. <u>Kelly v. Lynaugh</u>, 862 F.2d 1126, 1133 (5th Cir. 1988) (refusing to consider habeas claim raised for the first time on appeal), <u>cert. denied</u>, 492 U.S. 925, 109 S.Ct. 3263 (1989).[6]

D. FAILURE TO <u>SUA SPONTE</u> HOLD COMPETENCY HEARING

McBride argues that his due process rights were violated by the trial court's failure to <u>sua sponte</u> hold a competency hearing. He contends that his attempted suicide immediately after the murders and the resulting brain injury should have raised a bona fide doubt in the trial judge's mind as to his competency.

Due process requires a trial court to order a competency hearing <u>sua sponte</u> if the evidence before the court raises or should raise a bona fide doubt concerning competency. <u>See</u> <u>Pate v. Robinson</u>, 383 U.S. 375, 86 S.Ct. 836 (1975). A habeas petitioner has the burden of showing that the objective facts known to the trial court were sufficient to raise a bona fide doubt as to the petitioner's competency. <u>Enriquez v. Procunier</u>, 752 F.2d 111, 113 (5th Cir. 1984), <u>cert. denied</u>, 471 U.S. 1126, 105 S.Ct. 2658

---

[6] Even assuming the claim had been properly raised, McBride cannot show prejudice in light of his failure to show a reasonable probability that Dr. Dunnington's testimony would have caused a different outcome at the punishment phase of the trial. <u>See</u> Section F below.

17

(1985). To determine whether a competency hearing should be held, the trial court should consider (1) any history of irrational behavior, (2) the defendant's demeanor at trial, and (3) prior medical opinions. Id.

In regard to the first factor, the district court found that other than having an uncontrollable temper, McBride had no history of irrational behavior. Relying solely on his suicide attempt immediately after the murders, McBride compares himself to the petitioner in Pate v. Robinson, 383 U.S. 375 (1966). McBride's comparison of his circumstances to those of the petitioner in Pate is unconvincing. In Pate, several witnesses gave detailed and uncontradicted testimony about the petitioner's "long history of disturbed behavior" and thought he was "insane." Pate, 383 U.S. at 378, 383. Some years before the petitioner in Pate was convicted for the crime for which he sought habeas relief, he murdered his infant son and then "attempted suicide by shooting himself in the head." Id. at 381. The suicide was not the only evidence the Supreme Court relied on to determine that the petitioner should have been afforded a competency hearing; rather, it was but one of a litany of the petitioner's demented actions that occurred both long before and after the attempted suicide. Id. at 378-83. See also United States v. Davis, 61 F.3d 291, 304 (5th Cir. 1995) (direct criminal appeal) (attempted suicide standing alone was insufficient to create sufficient doubt of competence to stand trial), cert. denied, __ U.S. __, 116 S.Ct. 961 (1996).

18

In regard to the second factor, McBride's demeanor at trial, as previously set forth, defense counsel testified at the evidentiary hearing that McBride appeared to understand the charges against him and that he consulted with counsel in a manner that assisted in preparing his defense. When asked whether he had any doubt about McBride's "ability to assist you in his defense," counsel responded that the "only reason at all" to doubt McBride's competency was the fact of the head injury itself. However, none of McBride's witnesses identified any specific evidence that suggested that he was incompetent. Lead counsel admitted that he felt there was "no basis" for requesting a competency hearing.

In regard to third factor regarding prior medical opinions, McBride relies on Dr. Morgan's testimony. On September 2, 1986, prior to McBride's murder trial, a hearing was held on several motions. One of these motions was a motion for continuance that was based not on McBride's alleged incompetence, but on the fact that the injury required cosmetic surgery due to a sunken area in his forehead.[7] At that pretrial hearing, Dr. Morgan, who had performed surgery on McBride immediately after the suicide attempt, testified that the bullet from the self-inflicted wound entered just under McBride's chin, went through his tongue and palate, and

---

[7] The surgical procedure was a cranioplasty, which involved installing an acrylic plate in the skull. The primary purpose of the procedure was cosmetic and the secondary purpose was for protection. The testimony indicated that such an operation should not be performed until at least a year after the injury.

exited the top of his head "at about his hairline." A "significant amount of damage to the right frontal lobe of [McBride's] brain" resulted. Dr. Morgan also testified that there is no "specific function assigned to the very front part of the frontal lobe where he was injured, especially if it involves only, or primarily one side of the brain; an individual can lose a fair portion of that without suffering much in the way of discernable neurological deficit." When asked by the prosecutor whether McBride had suffered any of loss of "his thinking ability, or thought processes," Dr. Morgan responded:

> As far as gross neurological deficit, after his injury, besides the loss of smell, we did not think he had any discernable gross neurological deficit.
> He seemed to talk and respond, as we expected.
> As far as discreet testing, regarding his thought processes, that requires a battery of psychological tests, and those were not done.

Even at this early stage of the proceedings--less than a year after McBride suffered a brain injury and over a year before trial began--there was little, if any, evidence to suggest that he was not competent to stand trial.[8]

Dr. Morgan gave similar testimony during the guilt-innocence phase of McBride's trial. He testified that McBride had no gross

---

[8] Additionally, a nurse at the Sheriff's Department infirmary where McBride was then incarcerated testified that she talked with McBride and that he was "a very intelligent young man . . . [and] knowledgeable in world affairs as well as business." When asked whether McBride had "any mental problems . . . that would cause him not to understand what was going on,", she replied, "[n]one whatsoever."

neurological deficit, explaining that McBride "is able to speak and think reasonably well, without going into in-depth psychological testing, he walks and talks and he moves all four extremities well, has normal reflexes and sensation, and is able to see and hear. The only thing that he appeared to have missing was the sense of smell."

McBride has not identified a "history" of irrational behavior, unusual behavior during the proceedings against him, or any medical opinions before the trial court that would have created a bona fide doubt regarding his competency to stand trial. Thus, he is not entitled to relief on this claim.

E.    DUE PROCESS CHALLENGE TO JURY INSTRUCTION

McBride contends that sentencing instructions at his trial denied him due process, in that TEX. CODE CRIM. PROC. article 37.071 statutorily prohibits courts from informing jurors of the effect of their failure to agree unanimously on a capital punishment.[9]  He argues that although article 37.071(d)(1) and (2) require a Texas court to impose a life sentence in a capital case when a jury is unable to agree unanimously on a response to a special issue, article 37.071 unconstitutionally prohibits courts from informing

---

[9]  "The court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the effect of failure of the jury to agree on an issue submitted under this article."  Art. 37.071(g) (Supp. 1986) (redesignated as art. 37.071 § 2(a) (1991)); see Davis, 51 F.3d at 465 n.11.

jurors that any one of them can thereby prevent a death sentence.[10]
McBride relies largely on Mills v. Maryland, 486 U.S. 367, 108
S.Ct. 1860 (1988), and Andres v. United States, 333 U.S. 740, 68
S.Ct. 880 (1948).

McBride's argument is foreclosed by our precedent.  We
previously have held that the claim is barred by the
nonretroactivity doctrine of Teague v. Lane.  Webb v. Collins, 2
F.3d 93, 94-95 (5th Cir. 1995).  Addressing the challenge of a
habeas petitioner who was sentenced to death in 1986 and whose
conviction became final in 1989, this Court observed that Andres
and Mills were decided before the petitioner's conviction became
final.  Id.  We recognized that although

> [t]he Supreme Court's decisions in Andres and
> Mills may inform the analysis of [the] claim,
> . . . they do not dictate the constitutional
> rule urged by [the petitioner].  Both Andres
> and Mills involve statutory schemes different
> from the Texas sentencing statute and
> different legal standards.  Thus because [the
> petitioner] does not suggest that his claim
> comes within an exception [to Teague], Teague
> forecloses [the Court's] consideration of
> [the] claim. . . .

---

[10]  McBride's jury was charged under the following provision
as to the special issues:

> (d)  The court shall charge the jury that:
>
> (1)  it may not answer any issue "yes" unless
> it agrees unanimously; and
>
> (2)  it may not answer any issue "no" unless
> 10 or more jurors agree.

TEX. CODE CRIM. PROC. art. 37.071(d) (1981).

22

_Id._ at 96; see also _Davis_, 51 F.3d at 466-67 (rejecting same claim after petitioner had failed to argue in district court that any "new rule" fell within a _Teague_ exception).

McBride now argues that his challenge to article 37.071(g) falls within the second of the two _Teague_ exceptions, in that his proposed new rule amounts to a "watershed rule of fundamental fairness." McBride cursorily raised this argument in his objections to the magistrate judge's recommendation, asserting broadly that his "claim comes within the second exception to nonretroactivity announced in _Teague v. Lane_." Because this Court has held that the substance of McBride's argument is "meritless," we need not determine whether McBride adequately preserved his argument regarding the second exception to _Teague_. _Jacobs v Scott_, 31 F.3d 1319, 1328 (5th Cir. 1994), cert. denied, 513 U.S. 1067, 115 S.Ct. 711 (1995).[11] In _Jacobs_, we explained that the Supreme Court's decision in _Mills_ has been interpreted "to mean that `each juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.'" _Id._ (quoting _McKoy v. North Carolina_, 494 U.S. 433, 442-43, 110 S.Ct. 1227, 1233 (1990)) (brackets in opinion). We further explained that the statutory framework in Texas was entirely different from that in _Mills_. We declared _Mills_

---

[11] We realize that in _Jacobs_ our discussion of this issue was in the context of whether he had shown prejudice to overcome the procedural bar. Nevertheless, we explicitly rejected the "substantive argument" as "meritless." 31 F.3d at 1328.

to be inapposite because, unlike the statutory framework at issue in Mills, "[u]nder the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance." Id. at 1329. Our holding in Jacobs precludes McBride from obtaining relief on this claim.

F.   BRADY CLAIM

A defendant's right to due process is violated when, upon a request for exculpatory evidence, the Government suppresses evidence that is both favorable to the defendant and material to the defendant's guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963). Exculpatory evidence as well as impeachment evidence falls under the Brady rule. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763 (1972). Evidence is material when a reasonable probability exists that its disclosure would have caused a different outcome at trial. United States v. Bagley, 473 U.S. 667, 674-75, 105 S.Ct. 3375 (1985). A reasonable probability is a probability sufficient to cast doubt on the outcome. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 1558 (1995). Materiality is judged according to the cumulative effect of all the undisclosed evidence. Id. at 1567.

McBride contends that the prosecution failed to disclose Dr. Dunnington's opinion, which he alleges constituted mitigating evidence regarding his future dangerousness. Dr. Dunnington was a radiologist who assisted in the treatment of McBride's self-

24

inflicted wound. McBride contends that Dr. Dunnington's testimony would have bolstered the defense theory at the punishment phase that McBride would no longer be dangerous as a result of the injuries suffered from the gunshot wound.

At the evidentiary hearing, it was established that Dr. Dunnington's name was on the witness list supplied by the state prior to trial and that McBride's medical records contained Dr. Dunnington's name. Further, there was some evidence to indicate that Dr. Dunnington's report was contained in McBride's medical records. Trial counsel admitted that McBride's medical records were available to the defense. Based on this evidence, the district court concluded that the evidence was not suppressed because "at least Dr. Dunnington's name was as readily available to McBride's defense lawyers, and to McBride, as it was to the prosecutors." Citing Williams v. Scott[12], the district court stated that "a Brady violation does not arise if the defendant using reasonable diligence could have obtained the same information as was found to have been in the hands of the prosecution." McBride asserts that the "diligence" standard applied by the court conflicts with Brady itself. This Court repeatedly has held, however, that the prosecution has no obligation to produce evidence that a defendant could have obtained "from other sources by exercising due diligence." See Brown v. Cain, 104 F.3d 744 (5th

---

[12]  35 F.3d 159, 163 (5th Cir. 1994), cert. denied, 513 U.S. 1137, 115 S.Ct. 959 (1995).

25

Cir.), cert. denied, __ U.S. __, 117 S.Ct. 1489 (1997) (citations omitted). Indeed, we have gone so far as to state that "[d]ue diligence in failing to locate exculpatory material is a necessary element of a successful Brady claim." United States v. Mmahat, 106 F.3d 89, 94 (5th Cir. 1997), petition for cert. filed, (U.S. June 16, 1997) (No. 96-9431). Although McBride takes great pains in attempting to convince this Court that our precedent "does not stand for the general principle which the [district court] seized upon to deny relief," we are unpersuaded.

In the alternative, McBride contends that his attorney's specific request for Brady material constituted sufficient "diligence."[13] Even assuming counsel's request constituted due diligence, we find his Brady claim fails. At the evidentiary hearing, McBride established that, prior to McBride's capital murder trial, an investigator in the district attorney's office interviewed Dr. Dunnington. The investigator then prepared an interoffice file memo that provided as follows:

> I did talk with Dr. Dunnington, MD-Dept. of Radiology . . . he reviewed his work and it was his opinion that McBRIDE did probably have enough damage to alter his personality, but to what extent he could not say. He was of the opinion that he didn't think anyone (based on

---

[13] McBride also argues that, regardless of the exercise of diligence, defense counsel could not reasonably be expected to investigate the possibility that a radiologist would express a medical opinion concerning future dangerousness because a radiologist's training and specialty involves the diagnosis of physical injury through x-rays, not the practice of psychiatry. This argument proves too much in that it undermines the validity of Dr. Dunnington's opinion regarding McBride's future dangerousness.

> McBRIDE's specific damage) could actually say that he would or would not be a continuing threat. Dr. Dunnington is not a neuro-radiologist, but he is the one that read McBRIDE's X-Rays at LGH . . . copy of his report is contained with in the medical records.

(ellipses in original). This memo suggests that Dr. Dunnington's opinion about McBride's future dangerousness was ambivalent and uncertain. Consistent with the memo, the investigator testified at the evidentiary hearing that, during the interview, Dr. Dunnington related that he could not predict what kind of effect the injury would have had on McBride's future behavior. The transcript of the evidentiary hearing reflects that Dr. Dunnington had been deposed prior to the hearing and a transcript of that testimony was entered into evidence; however, McBride has not made that deposition a part of the record on appeal.

On cross examination, defense counsel admitted that during the deposition Dr. Dunnington testified that it was impossible to predict McBride's future dangerousness based on his X-rays and CAT scans after the injury. According to defense counsel, Dr. Dunnington believed that "you look at his behavior subsequent to the wound and . . . based on his behavior subsequent to that, you can tell. You can tell whether they are uncontrollably violent, or they are going [to be] passive." As set forth previously, during the punishment phase, several fellow jail inmates testified that, while McBride was awaiting trial, he had on several occasions lost his temper, used offensive language, and attacked people "with little or no provocation." That evidence certainly undermines

27

McBride's claim that Dr. Dunnington's testimony would have bolstered the defense theory that he would no longer be dangerous as a result of the injuries suffered from the gunshot wound.

Under these circumstances, McBride has failed to show that Dr. Dunnington's testimony was favorable, much less a reasonable probability that it would have caused a different outcome at the punishment phase of trial.

The judgment of the district court is AFFIRMED.